# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

### JUNE SESSION, 1998

FILED

December 21, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 02C01-9710-CR-00406 |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | SHELBY COUNTY |
| VS. | ) | |
| | ) | HON. JOSEPH B. DAILEY |
| ANTONIO L. SAULSBERRY | ) | JUDGE |
| & FRANKLIN C. HOWARD, | ) | |
| | ) | |
| Appellants. | ) | (First Degree Murder; Aggravated |
| | ) | Robbery) |

ON APPEAL FROM THE JUDGMENT OF THE
CRIMINAL COURT OF SHELBY COUNTY

FOR THE APPELLANT:

STEFFEN G. SCHREINER
Attorney for Appellant Saulsberry
295 Washington Avenue, Suite 3
Memphis, TN 38103

JOSEPH S. OZMENT
Attorney for Appellant Howard
217 Exchange Avenue
Memphis, TN 38103

JAMES V. BALL
Attorney for Appellant Howard
217 Exchange Avenue
Memphis, TN 38103

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

PETER M. COUGHLAN
Assistant Attorney General
425 5th Avenue North
Nashville, TN 37243

WILLIAM L. GIBBONS
District Attorney General

TERRELL L. HARRIS
J. ROBERT CARTER
PHILLIP GERALD HARRIS
Assistant District Attorneys General
Criminal Justice Complex, Suite 301
201 Poplar Street
Memphis, TN 38103

OPINION FILED _____

AFFIRMED IN PART; REVERSED IN PART; REMANDED

PAUL G. SUMMERS, JUDGE

# OPINION

The Defendants, Antonio L. Saulsberry and Franklin C. Howard, pursuant to Tennessee Rule of Appellate Procedure 3(b), appeal as of right their convictions for first degree premeditated murder, especially aggravated robbery, and conspiracy to commit aggravated robbery. In addition, Defendants appeal the trial court's application of consecutive sentencing. These convictions arose from the robbery of a Memphis T.G.I. Friday's restaurant and the murder of its manager, Gene Frieling.

Defendants present ten assignments of error: (1) the trial court erroneously admitted a photograph of the deceased victim; (2) the evidence was insufficient to show premeditation or intent for first degree murder; (3) criminal responsibility for first degree premeditated murder is not supported by the proof and the trial court erroneously charged the jury on criminal responsibility; (4) the trial court erroneously charged the jury on the elements of first degree premeditated murder; (5) the trial court failed to charge the jury of the need for moral certainty to convict; (6) the trial court failed to instruct the jury that a prior inconsistent statement could be considered for impeachment purposes only; (7) the trial court erroneously admitted a videotape of the crime scene and commented on the portion of tape not shown to the jury; (8) the errors made by the trial court amount to cumulative error, requiring a new trial; (9) the trial court erroneously imposed consecutive sentences; and (10) the trial court failed to grant a necessary mistrial based upon an alleged discovery violation by the State.[1]

---

[1] In the interest of clarity, we address these points of alleged error in a different order.

Defendants were indicted by the Shelby County Grand Jury in July of 1995 on charges of premeditated murder in violation of Tennessee Code Annotated § 39-13-202(a)(1), murder committed during the perpetration of a robbery in violation of § 39-13-202(a)(2), murder committed in perpetration of a burglary in violation of § 39-13-202(a)(2), especially aggravated robbery in violation of § 39-13-403, and conspiracy to commit a felony in violation of § 39-12-103. Defendants were convicted by a jury on February 14, 1997, of first degree premeditated murder, especially aggravated robbery, and conspiracy to commit aggravated robbery.

Following a sentencing hearing, the trial court sentenced Defendant Saulsberry as a Range II offender to forty years for especially aggravated robbery and ten years for conspiracy. Defendant Howard was sentenced as a Range I offender to twenty-five years for especially aggravated robbery and six years for conspiracy. The trial court ordered all sentences, including life imprisonment, to run consecutively.

## I. SUFFICIENCY OF THE EVIDENCE

In their second and third issues, Defendants maintain that the evidence presented was insufficient to convict them of first degree premeditated murder, by either a theory of direct liability or a theory of criminal responsibility for the conduct of another. In particular, Defendants claim that the "record is devoid of any evidence indicating premeditation or deliberation." Following a careful examination of the record, we conclude that the State did not present evidence sufficient to permit a jury to convict Saulsberry of premeditated murder, but we affirm the premeditated murder conviction of Howard.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact beyond a reasonable doubt." Tenn. R. App. P. 13(e). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1976), and State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977)); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Holt v. State, 357 S.W.2d 57, 61 (Tenn. 1962).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914 (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191 (citing Cabbage, 571 S.W.2d at 836)). Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. See Tuggle, 639 S.W.2d at 914.

The record in this case reveals a cast of five criminal actors: Claude Sharkey, Clashaun ("Shaun") Sharkey, Kevin Wilson, Defendant Franklin Howard, and Defendant Antonio Saulsberry.[2] Defendant Saulsberry was

---

[2] The State joined all five men in the same indictment but tried them separately.

employed at the restaurant prior to January 28, 1995, the date of this incident. According to the proof at trial, Claude, Shaun, Wilson, and Saulsberry discussed robbing T.G.I. Friday's restaurant ("Friday's") the day before the crime. In the early morning hours of January 28, 1995, after the restaurant closed business for the prior night, Claude, Shaun, Wilson, and Howard drove to Friday's and waited in the back parking lot.

Friday's dishwasher John Wong exited the restaurant through its back door to dispose of the night's garbage, and the perpetrators used this opportunity to enter the building. Wong heard one man say, "Shoot the mother . . . ," referring to Wong. He was pushed from behind with a gun and ordered to lie down on the ground, and he complied.

Claude, Shaun, Wilson, and Howard continued through the back area of the restaurant toward the manager's office, where they encountered bartender Preston Shea. Shea saw four armed men[3] with ski masks walking toward him and screaming. He was knocked to the ground by one perpetrator outside the manager's office. At least two men entered the office and screamed, "Give me the money," and "Where's the f__king money." Shea responded by holding up his wallet and pleading, "Please, God, take the money and go." He heard bags of money being passed from person to person above his head and heard one man say, "Shoot his ass." Shea then heard a shot from the manager's office, where the perpetrators had already taken the money from the victim, Gene Frieling.

---

[3] Defendant Howard denied entering the restaurant and denied being armed; however, it is undisputed that no one else drove to the scene with Claude, Shaun, Wilson, and Howard.

-5-

Wong, remaining on the floor during the disturbance, also heard one of the perpetrators demand, "Give me the money—give me the money," and he heard Frieling say, "Take it, take it, take it." Wong heard "[o]ne explosion then two—the two that I heard, it was like two in one—the swiftness of it that followed behind—one behind the other." Then Frieling said, "Jesus Christ, he shot me, he shot me."

Shea had been repeatedly kicked during this episode, and as the men left the office, he was shot three times—twice in the leg and once in his lower back, through his bladder and intestines. He then crawled into the office and called 911, but he was too injured to stay with the telephone. As he fell back to the floor, Wong took the telephone and finished the 911 call.

Jessica Hoard, a server at Friday's, also testified for the State. Hoard was the only other employee still present on the morning of January 28, and she was in the dining room of the restaurant when the perpetrators arrived. One of the men ordered her to walk into the kitchen and commanded, "Get on the floor before I shoot you." She heard one person say, "Where's the money," a couple of times, and she then heard at least two gunshots. When she believed the perpetrators were gone and she could safely stand up, Hoard helped John Wong attend to the wounded Frieling and Shea. Because Frieling was only barely breathing, the two uninjured employees decided to lift him from a prone position to an upright position. Frieling remained in this sitting, slumped posture until he was found by police and determined dead. An autopsy revealed that the cause of death was a gunshot wound to the heart.

On February 9, 1995, Defendant Saulsberry made a statement to police recounting his involvement in the events preceding the robbery:

> It was first brought up on my way home a day before the robbery. Me, Claude, Shaun, and Kevin [Wilson] were in Claude's car. He was taking me home from the neighborhood. And, we were smoking "bud" (marijuana) on our way home. And, ah, Claude said, "Hey, what's up with Friday's"? I said, what do you mean what's up - you're ready to start working there? Then, he said, "Nall, man, nall, man, I'm talking about hitting that joint." I said, man, you're crazy than a motherf__ker. Then, he said, "Nall, nigger, I'm serious!". So, we didn't say anything else about that. When we got to my house, we sat in the car on the parking lot outside my house. Then, "Little Kevin" said, "What time the joint closes"? And, I said, at one (1) o'clock A.M. Then, Claude had showed me a silver gun. And, I said, hurry up and get me out of here. I got out of the car and Shaun got out with me. Then, I said, Shaun, man, is that boy serious? Shaun said, "Yes, man, he's broke, man". I said, man, y'all can try that dumb shit if you want too [sic], but I ain't got nothing to do with it. Basically, that's it, really.

Saulsberry denied telling anyone where the safe was located within the restaurant or how much money would be available there, but he admitted informing Claude, Shaun, and Wilson how to gain entry from the back of the restaurant. The State introduced testimony that Saulsberry was ultimately paid $50 for his role in the robbery and that he was dissatisfied with this amount—facts that Saulsberry disputed in his statement. It is undisputed, however, that Saulsberry was not present at T.G.I. Friday's the night of the robbery and murder.

Defendant Howard was present at the crime scene, and his statement to police on February 7, 1995, related events at the restaurant:

> I was riding with them [Claude, Shaun, and Wilson]. Claude said he said man we need to go on and do that. I was sleeping in the back seat and I heard him say we need to go on and do this right. So we rode up to T.G.I. Friday's and sat up there in the back part behind the Steakhouse Restaurant and we went on and walked up there.

-7-

> I stayed all the way in the back and they ran in the restaruant [sic] and I heard some shots fired so I ran to the car and they ran to the car and Kevin [Wilson] said I shot him man I shot him. So we left and went back to Claude's house and then we just stayed over there until the morning came and I told him to take me home.

According to Howard's statement, Claude, Shaun, and Wilson were armed when they entered the restaurant. After the robbery, Howard received a portion of the proceeds, although the amount is disputed.

While we agree with both the State and Defendants that this is quite a typical felony murder prosecution, we cannot agree with the State that the evidence supports a verdict of premeditated murder against Saulsberry.[4] To support findings of premeditation and deliberation, the State relies on circumstantial evidence, specifically:

> Given the perpetrators' commands to each other to shoot the employees, the murder of the manager after he had done everything asked of him, and Shea's testimony that they came back, stood over him and shot him three times after he had given them his wallet, a rational jury could find that the perpetrators deliberately went into the restaurant with a plan.

In our view, more is required to sustain a conviction for first degree premeditated murder rather than felony murder. See State v. West, 844 S.W.2d 144, 147-48 (Tenn. 1992); State v. Brown, 836 S.W.2d 530, 540-43 (Tenn. 1992); State v. Boyd, 909 S.W.2d 50 (Tenn. Crim. App. 1995). Cf. State v. Leroy Hall, C.C.A. No. 03C01-9303-CR-00065, Hamilton County (Tenn. Crim. App., Knoxville, Dec. 30, 1996), aff'd by partial incorporation, State v. Hall, 958 S.W.2d

---

[4] Nor, however, can we agree that Saulsberry cannot be retried for felony murder, although this issue is not before us. The jury was strictly instructed to cease deliberations upon finding Defendants guilty of premeditated murder. When the jury found them guilty of premeditated murder, it did not render any further verdicts on homicide charges. This does not equate to an acquittal. State v. Burns, ___ S.W.2d ___ Appendix (Tenn. 1998).

679, 703-06 (Tenn. 1997); State v. Frank Whitmore, C.C.A. No. 03C01-9404-CR-00141, Blount County (Tenn. Crim. App., Knoxville, June 19, 1997). Because this crime was committed prior to our legislature's modification of the elements of premeditated murder, we must analyze these facts under prior law requiring deliberation as an element of the offense.

In State v. Brown, our supreme court re-examined premeditation and deliberation, recognizing that over time, "prosecutors and judges had apparently fallen into the error of commingling these two elements by using the terms interchangeably." 836 S.W.2d at 539. According to the Brown court, this perception constituted a "substantial departure from the traditional law of homicide"—a departure which prompted the legislature to redraft the first degree murder statute to define premeditation and deliberation. Id. at 542. As defined by statute, a premeditated act was "one done after the exercise of reflection and judgment," and a deliberate act was "one performed with a cool purpose." Id. (quoting former Tenn. Code Ann. § 39-13-201(b)).

In light of this legislative clarification and what the Brown court perceived to be persistent infidelity to the historical foundation of first degree murder, the court emphatically rejected an amalgamation of the two formerly distinct mental states. Id. at 543. In addition, the court stated:

> [W]e think it is time to recognize . . . that "[m]ore than a split-second intention to kill is required to constitute premeditation," which "by its very nature is not instantaneous, but requires some time interval."
> . . . [I]t is now abundantly clear that the deliberation necessary to establish first-degree murder cannot be formed in an instant. It requires proof . . . that the homicide was "committed with a 'cool purpose' and without passion or provocation . . . ."

Id. (quoting Sentencing Commission Comments to former § 39-13-201(b)) (alterations in originals). In Brown, the defendant's premeditated murder conviction could not stand where the State offered circumstantial proof "that the defendant acted maliciously toward the child, in the heat of passion or anger, and without adequate provocation." Id. (footnote omitted). Furthermore, the court refused to find that repeated blows to the victim can alone support an inference of premeditation or deliberation. See id.

In State v. West, decided just six months after Brown, the supreme court considered a case much like the one at bar. 844 S.W.2d 144 (Tenn. 1992). The State argued that the defendant's emotional state and actions after the crime—calmness, failure to tell others about the crime, and concealment of the murder weapon—indicated premeditation and deliberation. Id. at 148. Rejecting this argument, the court explained, "The element of premeditation requires a previously formed design or intent to kill. . . . Deliberation, on the other hand, requires that the killing be done with a cool purpose—in other words, that the killer be free from the passions of the moment." Id. at 147 (citations omitted); see State v. Boyd, 909 S.W.2d 50, 54-55 (Tenn. Crim. App. 1995).

The West court declined to recognize concealment of evidence after a crime as probative of intent held prior to the crime, stating, "One who kills another in a passionate rage may dispose of the weapon when reason returns just as readily as the cool, dispassionate killer." 844 S.W.2d at 148. While the court acknowledged that proof of calmness after a crime may be plausible evidence of premeditation and deliberation, it failed to find any evidence material to show a calm emotional state and noted that the defendant's behavior indicated simply

-10-

"indifference to the victim and fear of detection." Id. Finally, the court rejected the State's theory that the defendant left the scene of a heated argument with the victim, obtained his gun at home, and went back to the scene to kill the victim:

> While the state's theory may be true, it remains only a theory, because the prosecution has no evidence to support it. No one witnessed the defendant's retrieval of a gun, nor does any circumstantial evidence exist to support this theory. . . . Thus, a jury would have to engage in pure speculation to conclude that the defendant had returned to his house in order to get a gun with which to shoot [the victim]. Although the jury is permitted to disbelieve the defendant's testimony, it may not construct a theory based on no evidence at all.

Id.

In the case at bar, we find no evidence—direct or circumstantial—sufficient to permit a jury to find premeditation and deliberation on the part of Antonio Saulsberry, who was not even present when the murder was committed. The record clearly reveals that Antonio Saulsberry did not participate in the actual robbery; therefore, his conviction must be based upon criminal responsibility for the conduct of the shooter, rather than direct liability.

By statute, criminal responsibility requires that a defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). The record contains some evidence which, if believed by the jury, would at best support an inference that Saulsberry (1) aided a robbery, with the intent that a robbery be committed; and (2) intended or expected to receive some proceeds from the robbery. The record does not, however, contain any evidence that Saulsberry intended to assist in the commission of a murder, intended that a

-11-

murder take place, or intended to benefit in the proceeds or results of a murder, whatever they may be. There is no evidence tending to show an intention, or even an expectation, prior to the robbery, that murder would facilitate the robbery.

Although the State directs our attention to Saulsberry's statement, in which he recalls that Claude Sharkey showed him a silver gun, to demonstrate Saulsberry knew and intended that a murder occur; we believe this evidence tends to show only that Saulsberry knew an armed robbery could occur. Next, the State points to Claude's statement to Saulsberry, "I'm talking about hitting that joint." Here again, we find no evidence to support knowledge of any act other than robbery, much less intent for any other act to occur. Though murder is a consequence of many armed robberies, a finding of intent in this case requires "pure speculation" of the type warned against in West. We again emphasize that our focus is on whether the evidence is sufficient to support convictions for premeditated first degree murder, rather than felony murder. Saulsberry's premeditated murder conviction is reversed.

Likewise, with respect to Franklin Howard, the Defendant argues that all circumstantial evidence presented by the State to show premeditation and deliberation is probative only of an intent to rob. The State produced evidence sufficient to permit a jury to find that Howard participated in the robbery by entering Friday's restaurant carrying a weapon, though this testimony was disputed. The State offered no proof, however, that Howard murdered the victim in this case, Gene Frieling. In fact, the only gun found in Howard's possession was conclusively determined not to match shells and bullet fragments recovered.

Therefore, Howard's conviction must also be based upon his criminal responsibility for the conduct of the shooter.

The State argues that intent can be inferred from the general conduct of the perpetrators: commands by one to shoot the employees of the restaurant, the fact that the victim was killed despite compliance with the robbery, and the fact that Shea was shot despite giving them his wallet. Evidence regarding the severity or cruelty of the act can be relevant to premeditation and deliberation on the part of the principal actor. See State v. Brown, 836 S.W.2d 530, 541-42 (Tenn. 1992); State v. Leroy Hall, C.C.A. No. 03C01-9303-CR-00065, Hamilton County (Tenn. Crim. App., Knoxville, Dec. 30, 1996), aff'd by partial incorporation, State v. Hall, 958 S.W.2d 679, 705 (Tenn. 1997).

In State v. Frank Whitmore, a principal's actions cast a circumstantial shadow of intent onto a companion, in the absence of direct evidence of the companion's intent prior to the murder—evidence such as an agreement to kill, words of encouragement, or assistance in preparatory operations with knowledge that a murder would occur. C.C.A. No. 03C01-9404-CR-00141, Blount County (Tenn. Crim. App., Knoxville, June 19, 1997). In Whitmore, a panel of this Court affirmed the defendant's conviction for premeditated murder based upon criminal responsibility where the evidence showed that the defendant drove with Williams, the principal in the murder, to the victim's home for the purpose of committing a burglary and theft. The testimony indicated that the defendant and Williams intended only to scare the victim with a knife carried by Williams—in fact, they waited until they thought he had gone to bed before entering. However, the evidence also revealed that, once inside the house, they encountered the victim,

-13-

and Williams began to fight with him. As the armed Williams wrestled for several minutes with the victim, who was vigorously fighting back, the defendant moved through the house searching for money. The defendant made no attempts to stop the struggle or disassociate himself from the enterprise at that point. From this evidence, we believed the jury could have reasonably concluded that, once the struggle began within the home, the defendant formed or shared or acquiesced in the intent that a murder occur.

We think the resolution of Defendant Howard's criminal liability for premeditated murder is governed by the Tennessee Supreme Court's 1997 case of State v. Carson, 950 S.W.2d 951 (Tenn. 1997). In Carson, the defendant, Gary, and Stover met to discuss robbing a TV repair store in Knoxville. The defendant Carson had been in the store before. He described the layout and where money could be found. Carson gave a weapon to each of his cohorts. The trio drove to the store. Carson waited in the car while Gary and Stover entered the store under a ruse that they needed to have a stereo repaired.

Gary and Stover held two employees, Adams and McGaha, at gunpoint. They forced the victims into a rear room, searched them, and stole $130 from Adams. Gary and Stover bound the victims with telephone cord, closed the door, and told the victims not to attempt to escape. They then fired three shots through the door and almost hit the victims.

Upon leaving the store, Gary and Stover were surprised to find the car and Carson gone. They exchanged gunfire with police, and they fled. All three culprits were later found and arrested.

Carson was charged like his codefendants. Gary and Stover pled guilty and testified against Carson. Although Carson did not testify, his police statement admitted driving his codefendants to the scene but denied knowledge that a robbery would occur. He said he believed Gary and Stover were going to the store to sell the guns they brought.

The jury found Carson guilty of aggravated robbery, aggravated assault (two counts), and felony reckless endangerment. Carson argued on appeal that he lacked the culpable mental state for the offenses committed by his partners in crime.

Carson adopted the "natural and probable consequence" rule. See id. at 955. This rule is based on the premise that criminal aiders and abettors should be responsible for crimes "they have naturally, probably and foreseeably put in motion." Id. Carson's convictions were all affirmed. The Court opined "that the evidence was sufficient to find that the defendant, having directed and aided in the aggravated robbery with the intent to promote or benefit from its commission, was criminally responsible for all of the offenses committed by his codefendants, to wit: aggravated assault and felony reckless endangerment." Id. at 956.

We are of the opinion that Carson dictates Howard's criminal responsibility for premeditated murder. While in the parking lot and before entering the restaurant, one of the perpetrators stated, "Shoot the mother . . .," referring to Wong. All four perpetrators then entered the restaurant armed, acted with a common purpose, committed acts of violence against various employees, shot and wounded one employee, and shot and killed another. Under these

circumstances, Howard cannot escape criminal responsibility for premeditated murder by claiming he did not share the criminal intent or premeditation with the actual triggerman. Hence, we find the evidence sufficient to find Howard guilty of premeditated murder.

## II. ADMISSION OF EVIDENCE

In their first and seventh issues, Defendants contest the decision of the trial court to admit a photograph of the deceased victim and a videotape of the crime scene made by police. They allege that admission of these pieces of evidence was error, prejudicing their right to a fair trial. We find no error in the trial court's decision to admit this evidence.

### A. Photograph of the Deceased Victim

The photograph to which Defendants object depicts the victim after his death, seated on the floor of the restaurant office. The photograph was taken by police at the scene and introduced as an exhibit to testimony. Defendants argue both that the probative value was substantially outweighed by its prejudicial value and that its admission constituted the needless presentation of cumulative evidence. Defendants claim that the only possible function of the evidence was to inflame the jury. We disagree.

Tennessee Rule of Evidence 403 governs Defendants' claim: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. In

Tennessee, we have long "followed a policy of liberality in the admission of evidence." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); see State v. Odell Smith, C.C.A. No. 02C01-9707-CR-00259, Shelby County (Tenn. Crim. App., Jackson, Aug. 10, 1998). In this respect, the trial court is entrusted with wide discretion to admit or refuse a tendered piece of evidence. See State v. Harbison, 704 S.W.2d 314, 317 (Tenn. 1986); Banks, 564 S.W.2d at 949.

Our supreme court has prescribed factors for a trial judge to consider when deciding whether to admit a certain photograph, including:

> the value of photographs as evidence, that is, their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

Banks, 564 S.W.2d at 951. Here, the photograph was accurate and clear; and although the victim had been moved, the photograph correctly depicted the position in which he died and was found by police—he was still breathing when moved. Furthermore, the photograph was not inflammatory or gruesome. No blood was evident, and no wounds were exposed.

Defendants' claim that the value of the photograph could only be to inflame the jury is incorrect. The State presented three witnesses to this crime, all of whom testified extensively to the manner in which the events happened, including the shooting of the victim in his office and the moving of his body to permit him to breathe. The introduced photograph served to corroborate this testimony and to bolster the credibility of the State's witnesses. For this reason, the photograph

was relevant yet not needlessly cumulative.  See State v. Robinson, 930 S.W.2d 78, 84 (Tenn. Crim. App. 1995).

### B. Videotape of Crime Scene and Victim

The same general policies should be considered by the trial court ruling on admissibility of a videotape.  See State v. Bigbee, 885 S.W.2d 797, 807 (Tenn. 1994); State v. Ronnie Michael Cauthern, C.C.A. No. 02C01-9506-CC-00164, Gibson County (Tenn. Crim. App., Jackson, Dec. 2, 1996), aff'd by partial incorporation, State v. Cauthern, 967 S.W.2d 726, 743 (Tenn. 1998).  Our supreme court has stated that "the admissibility of authentic, relevant videotapes of the crime scene or victim is within the sound discretion of the trial judge, and his ruling on the admissibility of such evidence will not be overturned without a clear showing of abuse of discretion."  State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); see State v. McCary, 922 S.W.2d 511, 515 (Tenn. 1996) (in dicta).

Although Defendant Saulsberry failed to raise this assignment of error in his motion for new trial, we will address the issue with respect to both Defendants.  At trial, the State played a videotape for the jury containing scenes of the restaurant shortly after the police arrived.  Defendants present no argument for exclusion of the videotape, and we find no reason why the tape would fail to satisfy Tennessee Rule of Evidence 401 for relevancy.  Tenn. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").  In addition, we find no prejudice that would substantially outweigh the probative value of the videotape.  See Tenn. R. Evid. 403.

-18-

Defendants argue that the trial court erred by announcing to the jury that portions of the tape displaying removal of the victim's body would not be shown to them. Defendants claim that by informing the jury exactly what it would <u>not</u> see, the trial judge prejudiced their right to a fair trial. We disagree and find no error. The trial judge's simple statement that the videotape showed removal of the deceased's body could not have communicated information of a prejudicial nature to the jury. Cf. <u>Cauthern</u>, 967 S.W.2d at 744 (affirming by incorporation this Court's decision that a videotape of police removing the defendant's body from the scene was admissible when it was relevant and when the probative value did not outweigh the prejudicial value). Therefore, Defendants' claim of error regarding admission of the photograph and videotape are without merit.

### III. JURY INSTRUCTIONS

In issues three through six, Defendants charge error in the instructions given by the trial court to the jury. Because Defendants presented only the sixth issue in their motions for new trial, we are permitted to consider the others waived as a matter of procedure. <u>See</u> Tenn. R. App. P. 3(e). However, in the interest of facilitating further review of this case, and because the State did not object, we have examined all alleged errors. We conclude that Defendants' claims are without merit.

Generally, a jury charge "should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." <u>State v. Hodges</u>, 944 S.W.2d 346, 352 (Tenn. 1997) (citing <u>Graham v. State</u>, 547 S.W.2d 531 (Tenn. 1977), and <u>State v. Forbes</u>, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995)). In addition, "[i]t is the duty of a trial judge to give a

complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986) (citing State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975)); see State v. Burkley, 804 S.W.2d 458, 461 (Tenn. Crim. App. 1990).  This Court also stated in Burkley, "In delivering its charge, a court should guard against an instruction which would withdraw from the jury's consideration any issue or evidence which they are entitled to consider."  804 S.W.2d at 461.

*A. Instructions on Premeditated Murder*

Defendants' fourth issue assigns error to the trial court's charge on first degree premeditated murder for two reasons: (1) because the judge used the phrase, "that the killing was intentional," rather than "that the defendant acted intentionally"; and (2) because the element of deliberation was separated on the page from the other elements of the offense.  We find no prejudicial error.

Tennessee Pattern Jury Instruction 7.01(a), the proper instruction for this case,[5] reads, in relevant part:

> For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:
> (1) that the defendant unlawfully killed the alleged victim;
> and
> (2) that the defendant acted intentionally.  A person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result;
> and
> (3) that the killing was deliberate.  A deliberate act is one performed with a cool purpose;
> and
> (4) that the killing was premeditated.

---

[5] Tennessee Pattern Jury Instruction 7.01(a) is the proper instruction for offenses committed prior to July 1, 1995, the effective date of legislative changes to the statute.

Tenn. Pattern Jury Instructions 7.01(a) (4th ed. 1995). Because Defendants'

latter argument concerns the visual impact of the instructions on the jury, we

reprint the relevant portion as written in this case:

> For you to find the defendant guilty of this offense, the state
> must have proven beyond a reasonable doubt the existence of the
> following essential elements:
> > that the defendant unlawfully killed the alleged victim; and that
> > the killing was intentional. A person acts intentionally with
> > respect to the nature of the conduct or to a result of the
> > conduct when it is the person's conscious objective or desire
> > to engage in the conduct or cause the result; and
> > that the killing was deliberate. A deliberate act is one
> > performed with cool purpose; and
> > that the killing was premeditated.

Although the elements "that the killing was intentional" and "that the

defendant acted intentionally" do convey different meanings, we decline to find

the distinction substantial enough to mislead the jury to Defendants' prejudice.

Consideration of the first element, "that the defendant unlawfully killed the alleged

victim," should have eliminated any confusion in the minds of the jurors.

(Emphasis added.) Clearly, conviction upon this particular instruction, as

opposed to criminal responsibility, requires a finding that the defendant himself

was the "triggerman."

Second, we find no error in the visual appearance of the elements.

Though the second element—intent—contains a period prior to its explanation,

so does the third element of deliberation. At a mere glance, the instruction could

be slightly confusing to the jury; but we find that even a careful reading is

unnecessary to clearly understand the instruction.

*B. Instruction on Moral Certainty*

Defendants next complain that the jury instruction on reasonable doubt violated due process protections. In their fifth issue, briefly consisting of a single quote, Defendants contest the trial court's use of Tennessee Pattern Jury Instruction—Criminal (T.P.I.) 2.03(a).[6] Specifically, they argue that omission of the term "moral certainty" reduced the jury's perception of the degree of certainty required to convict to a point less than that required by the Due Process Clause. We find no violation of Defendants' due process rights.

"[T]he Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." Victor v. Nebraska, 511 U.S. 1, 5 (1994). Furthermore, "so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." Id. (citations omitted). Therefore, it seems that, with respect to reasonable doubt, a trial court's error must typically be one of commission, rather than omission. There can be no mistake in failing to employ distinctive words or phrases, so long as the charge given is complete and accurate. Because we find that T.P.I. 2.03(a)—currently the alternate reasonable doubt jury instruction for this state—accurately conveys the level of certainty mandated by In re Winship, 397 U.S. 358, 364 (1970), we conclude that absence of the term "moral certainty" is of no consequence.

---

[6] We also note that the single case used by Defendants to show error by the trial court, State v. Derek Denton, C.C.A. No. 02C01-9409-CR-00186, Shelby County (Tenn. Crim. App., Jackson, Aug. 2, 1996), actually held that giving an instruction identical to the one in this case was not error.

-22-

Our supreme court has expressly permitted the use of "moral certainty" in this state's jury instructions. See Carter v. State, 958 S.W.2d 620, 626 (Tenn. 1997) ("The phrase is permissible if the context in which the instruction is given 'clearly convey[s] the jury's responsibility to decide the verdict based on the facts and law.'") (quoting State v. Nichols, 877 S.W.2d 722, 734 (Tenn. 1994)). Cf. Austin v. Bell, 126 F.3d 843, 847 (6th Cir. 1997), cert. denied, 118 S. Ct. 1526 (1998) (also accepting a "moral certainty" instruction). We note carefully and explicitly, however, that our supreme court has allowed use of the term, not encouraged its use. But cf. State v. Jose Holmes, C.C.A. No. 02C01-9505-CR-00154, Shelby County (Tenn. Crim. App., Jackson, Dec. 10, 1997); State v. Derek Denton, C.C.A. No. 02C01-9409-CR-00186, Shelby County (Tenn. Crim. App., Jackson, Aug. 2, 1996) (both expressing a preference for T.P.I. 2.03, rather than T.P.I. 2.03(a)).

Our courts have upheld a "moral certainty" jury instruction when confronted with defendants' arguments that the instruction itself, when given, permits a level of proof lower than that constitutionally required for conviction. See Carter, 958 S.W.2d at 625-26; Nichols, 877 S.W.2d at 734 (use of "moral certainty" permissible when context further explained reasonable doubt and properly reflected evidentiary certainty); Pettyjohn v. State, 885 S.W.2d 364, 365-66 (Tenn. Crim. App. 1994); State v. Hallock, 875 S.W.2d 285, 294 (Tenn. Crim. App. 1993); see also Amy K. Collignon, Note, Searching for an Acceptable Reasonable Doubt Jury Instruction in Light of Victor v. Nebraska, 40 St. Louis U. L.J. 145, 171 (1996) ("[A]lthough the Supreme Court hesitated upon the acceptability of phrases such as 'moral certainty' . . . , interpreting courts have

gleaned only that the instruction must pass constitutional muster having been read as a whole.").

Now, however, these particular Defendants complain that <u>failure</u> to provide a "moral certainty" instruction also encourages conviction upon a reduced degree of proof. We recently addressed this very issue with respect to T.P.I. 2.03(a) in <u>State v. Henning</u>, C.C.A. No. 02C01-9703-CC-00126, Madison County (Tenn. Crim. App., Jackson, Oct. 24, 1997); and we find no reason to deviate from our conclusion in that case that the instruction is not constitutionally deficient. <u>See id.</u> at 9; <u>see also</u> <u>Denton</u>, C.C.A. No. 02C01-9409-CR-00186, slip op. at 8 ("[W]e cannot conclude that the trial court erred by refusing to include the phrase 'moral certainty' in its charge.").

In <u>Henning</u>, we noted that T.P.I. 2.03(a) "tracks virtually identical language of pattern reasonable doubt instructions approved by a majority of the federal circuits." <u>Id.</u>; <u>see also</u> Collignon, <u>supra</u>, at 171 ("Clearly, the instruction with the most support comes from the Federal Judicial Center. That charge excludes all reference to 'moral certainty' or 'substantial doubt.'") (footnote omitted).

Reasonable doubt instructions not including the term "moral certainty" have been more widely used since the Supreme Court's opinion in <u>Victor v. Nebraska</u>, 511 U.S. 1 (1994), in which the Court expressed concern that the term could have "lost its historical meaning." <u>Id.</u> at 13. There, the Court held "moral certainty" constitutional within an instruction that "lends content to the phrase." <u>Id.</u> at 14, 16 ("The instruction thus explicitly told the jurors that their conclusion had to be based on the evidence in the case. Other instructions reinforced this

message."). Because of the changing nature of the phrase over time, however, the Victor Court clearly stated that it did not condone use of the phrase in reasonable doubt jury instructions. See id. at 16. As the Court noted, "the definitions of reasonable doubt most widely used in the federal courts do not contain any reference to moral certainty." Id. at 16-17; see id. at 24 (Ginsburg J., concurring in part and concurring in the judgment) ("I agree . . . with the Court's suggestion that the term 'moral certainty,' while not in itself so misleading as to render the instructions unconstitutional, should be avoided as an unhelpful way of explaining what reasonable doubt means.").

In the case at bar, we are convinced that T.P.I. 2.03(a) is not constitutionally deficient for lack of the phrase "moral certainty." Therefore, we find no error in the trial court's use of this alternative jury instruction.

*C. Instruction on Prior Inconsistent Statements*

Defendants' sixth assignment of error concerns the trial court's refusal to issue a contemporaneous curative instruction to the jury when the prior inconsistent statements of Claude Sharkey were introduced for impeachment purposes. Defendants claim that the judge should have instructed the jury that the statement could be used only for impeachment, not as substantive evidence.

Defendants correctly assert that failure by a trial court to issue a contemporaneous curative instruction for prior inconsistent statements could, under some circumstances, constitute reversible error. According to State v. Reece, 637 S.W.2d 858 (Tenn. 1982), failure to give a limiting instruction creates reversible error when "the impeaching testimony is extremely damaging, the need

for the limiting instruction is apparent, and the failure to give it results in substantial prejudice to the rights of the accused." Id. at 861.

This case is readily distinguishable from Reece, however. In Reece, the limiting instruction was never given, not even as part of the general jury charge. In this case, the jury was instructed at the end of testimony that it could consider impeaching prior inconsistent statements only for purposes of assessing credibility.

Although we are aware of cases in which federal courts have held a limiting instruction as part of the general jury charge insufficient where the impeaching testimony is extremely damaging, we need not determine whether this issue is a matter of constitutional or evidentiary import, because Defendants have failed to properly cite to the record. See Tenn. R. App. P. 27(g) ("[R]eference in the briefs to the record shall be to the pages of the record involved."). In their brief, Defendants inform the Court that the impeached witness' testimony can be found between pages 422 and 450 of the record, but they do not identify which portions of the testimony they consider damaging and do not establish how improper use of the testimony prejudiced them. The only guidance provided by Defendants is this:

> The testimony of Claude Sharkey can be found in the trial transcript from pages 422 thru [sic] 450. (Vol. VII and VIII) The testimony of Sharkey occurred on February 13, 1997. A review of that testimony clearly leaves room for confusion by the jury as to what they could consider for guilt or innocence versus impeachment especially where the jury was not charged with the proper use of such testimony until the afternoon of February 14, 1997, during the court's regular charge to the jury. It is also clear that certain statements in Sharkey's previous statement if taken as substantive evidence would be extremely damaging to both Appellants.
> . . .

> In the present case if the jury took Sharkey's statements as substantive evidence, which Appellants submit they did, it is an understatement to say that it resulted in substantial prejudice.

The whole of Claude Sharkey's testimony consists of impeachment by prior inconsistent statements. Where Defendants fail to meaningfully cite to the record such that alleged prejudicial error can be identified, we decline to search the record for it.

### D. Instruction on Criminal Responsibility

Defendants' third issue for review alleges that the trial court erred by failing to specifically instruct the jury that it must reach a unanimous decision on the theory behind their verdict. For example, if a portion of the jury convicted them as directly liable for the murder, a portion of the jury convicted based upon criminal responsibility for the conduct of Claude Sharkey, and a portion of the jury convicted based upon criminal responsibility for the conduct of Kevin Wilson, then Defendants claim the decision would have violated their constitutional right to a unanimous verdict.

This issue is moot as to Defendant Saulsberry. As to Defendant Howard, we find the argument meritless. In State v. Williams, 920 S.W.2d 247 (Tenn. Crim. App. 1995), this Court did not accept a similar argument. In Williams, the victim could not pinpoint which criminal held her down and which one of the two actually raped her. The defendant argued the possibility of a nonunanimous jury verdict because the State could not prove if he was the actual rapist or an aider. Our Court found that in Tennessee, under our criminal responsibility statute, it makes no difference. A defendant criminally responsible for a principal's acts is just as guilty as the principal actor.

## IV. CONSECUTIVE SENTENCING

In their ninth issue, Defendants argue that the trial court erred in imposing consecutive sentences, contending that the evidence does not indicate Defendants are dangerous offenders with little or no regard for human life. We find no error in the trial court's consideration or decision.

This Court reviews the length, range, or manner of service of sentence imposed by the trial court based upon a de novo standard. See Tenn. Code Ann. § 40-35-401(d). However, we owe the trial court's determination a presumption of correctness, see id., so long as the trial court "place[s] on the record its reasons for arriving at the final sentencing decision" and exhibits compliance with the statutory sentencing guidelines and principles. State v. Wilkerson, 905 S.W.2d 933, 934 (Tenn. 1995). Here, the record contains a lengthy and comprehensive deliberation by the trial court regarding Defendants' sentencing, and we therefore accord the sentence a presumption of correctness.

Defendants bear the burden of showing that the sentence is improper. See State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). Defendants allege that the aggregate term of life imprisonment "is quite reasonably sufficient in the terms of length to adequately punish [Defendants] and to adequately protect society," but they have nowhere identified any errors committed by the trial court or why consecutive sentencing is not appropriate in this case. They have failed to carry their burden.

In the interest of justice, however, we have examined the sentencing transcript and are satisfied that consecutive sentencing is appropriate in this case. Tennessee Code Annotated § 40-35-115 governs our analysis:

> (a) If a defendant is convicted of more than one (1) criminal offense, the court shall order sentences to run consecutively or concurrently as provided by the criteria in this section.
> (b) The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:
> . . .
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high.

Id. § 40-35-115(a), (b)(4). Moreover,

> The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender. In addition, the Sentencing Reform Act requires the application of the sentencing principles set forth in the Act applicable in all cases. The Act requires a principled justification for every sentence, including, of course, consecutive sentencing.

Wilkerson, 905 S.W.2d at 938; see also State v. Dale Nolan, C.C.A. No. 01C01-9511-CC-00387, Sequatchie County (Tenn. Crim. App., Nashville, June 26, 1997), perm. to app. denied (Tenn. 1998).

In the case at bar, the trial court explicitly found that Defendants satisfied the requirements of § 40-35-115(b)(4):

> As to the consecutive request, Mr. Howard does have an extensive record. And in my judgment, he is clearly a dangerous offender. He has shown no hesitation to commit a crime when the risk to human life was high.
> The facts of this case were so shocking and appalling that it is inconceivable to me that under any interpretation of the dangerous offender category these individuals would not be considered to be dangerous offenders. The facts that are in the record with regard to all four of them being armed, all four of them showing up at that back door, single file, marching into the store, each one having his own responsibility with regard to the completion of this robbery. The shootings that occurred with Mr. Frieling and Mr. Shea.

Their absolute and total lack of remorse after this is over, as evidenced by testimony from several individuals of the fact that they went back to the home of the one individual and played Nintendo for the rest of the night. That's just pretty amazing testimony that we heard during the course of this trial. That individuals after having participated in a crime of this sort would go back to a house and play Nintendo for several hours until, I guess, they got sleepy and went to sleep. It is just -- it's unbelievable. Clearly dangerous offenders.

With respect to Defendant Saulsberry, the court stated,

In my judgment, for the same reasons as those I indicated with regard to Mr. Howard, I think that consecutive sentencing is appropriate in this case as well.

The offense is so reprehensible and so atrocious, so unfathomable, that it is hard for me to imagine anyone defining this, these individuals, as anything other than dangerous offenders.

The court also found no hesitation to commit an offense when the risk to human life was high:

I think that's clearly established. And I think the case law supports it. I think there were -- well, I know that the record reflects that there were other individuals in the restaurant, the dishwasher, the waitress, others who were all put at risk. The potential to -- or the risk to their life was high. They were very much endangered during this whole episode, even though they were fortunate enough to have been spared. So I think that factor clearly applies.

Finally, the trial court specifically addressed whether an aggregate sentence reasonably related to the severity of the offenses involved. The court stated,

You have a robbery that was taking place, and a store manager who is saying, here, take the money, doing everything to comply with what the robbers were asking, and yet was shot. And then beyond that, the assistant manager, lying on the ground, doing everything he could to comply with what was being demanded, who was then gratuitously shot and left to die.

I mean, I think it is a situation where it is clearly distinguishable from, for example, a holdup where in the process of struggling over the money, somebody gets shot or something of that sort. [That] is all part and parcel of the robbery itself.

These events were all separate, independent, inexplicable, inexcusable, outrageous, unconscionable acts that are clearly distinguishable, I think.

We also find in the sentencing transcript ample evidence to show that the term imposed was necessary to protect the public from further crimes committed by these Defendants. At the time of sentencing, each Defendant had an extensive history of criminal behavior. In addition, the court found, for both, at least a limited history of unwillingness to comply with the conditions of a sentence involving release into the community. Our review of the above evidence is not affected by our finding of insufficient evidence to support premeditation and deliberation on the part of Defendant Saulsberry. We are convinced the trial judge fulfilled his duty in sentencing as to both Defendants.

## V. DISCOVERY MOTION

Defendants' ninth issue assigns error to the trial court's failure to grant a mistrial based upon an alleged discovery violation by the State. Defendants argue that the State did not comply with Tennessee Rule of Criminal Procedure 16, which requires disclosure of certain evidence by the State:

> Upon request of the defendant, the state shall permit the defendant to inspect and copy or photograph any results or reports of . . . scientific tests or experiments, or copies thereof, which are within the possession, custody or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the district attorney general and which are material to the preparation of the defense or are intended for use by the state as evidence in chief at the trial.

Tenn. R. Crim. P. 16(a)(1)(D). Specifically, Defendants argue that the State should have produced, in response to their Rule 16 discovery request, a report of tests performed on the .32 caliber revolver seized from Defendant Howard's residence.

The State replies first that Rule 16 is inapplicable because the test performed on the weapon was not a "scientific test" and because the expert made no "report." Rather, the State argues, the expert simply observed whether the barrel of the gun contained residue, to determine whether it had been cleaned since last fired, and he made only handwritten notes of the result. Although we do not accept the State's argument, we need not find this test within Rule 16 because we conclude that even if there was a violation, Defendants were not prejudiced.

Rule 16 prescribes the remedies for violation of its provisions: "the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Tenn. R. Crim. P. 16(d)(2). Here, the trial court offered to allow Defendants' counsel an opportunity to inspect the notes, which he declined to do. The record reflects that counsel objected to the existence of the alleged violation, but that he did not, in fact, move for a mistrial at this point. Although Defendants assert that they moved for a mistrial, they have not provided a citation to the record to permit meaningful appellate review.

Furthermore, the evidence not disclosed to Defendants revealed only that the gun found in Defendant Howard's home had not been cleaned since last fired; the evidence did not reveal when the gun had been last fired. Defendants have identified no prejudice—they have simply asserted that prejudice resulted—and we cannot ourselves identify any prejudice. The trial judge was within his discretion in refusing any request for a mistrial.

## VI. CUMULATIVE ERROR

We have concluded that only one error occurred and have remedied that error by reversing one Defendant's conviction for first degree premeditated murder. We find no cumulative error warranting further modification.

## VII. CONCLUSION

In conclusion, Defendant Saulsberry's conviction for first degree premeditated murder is not supported by sufficient evidence, and such conviction is therefore reversed and his case is remanded for a new trial on the charge of felony murder as alleged in Counts 2 and 3 of the indictment. We conclude that the trial court committed no other error. We affirm convictions for especially aggravated robbery and conspiracy as to both Defendants. We affirm Defendant Howard's murder conviction. Consecutive sentencing is affirmed. This case is remanded for such other proceedings as may be warranted and consistent with this opinion.

_____
PAUL G. SUMMERS, JUDGE

CONCUR:

_____
DAVID H. WELLES, JUDGE

_____
JOE G. RILEY, JUDGE

-33-